IAN A. WRIGHT (State Bar No. 271957)
KAITLIN H. OWEN (State Bar No. 305653)
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: 213-576-1000
Facsimile: 213-576-1100
E-mail: ian.wright@alston.com
kaitlin.owen@alston.com

Attorneys for Plaintiff
DUBCLUB, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DUBCLUB, INC.<br><br>Plaintiff,<br><br>v.<br><br>WHOP INC.; and BEAR MATTHEWS<br><br>Defendants | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff DubClub, Inc. ("DubClub") brings this action for injunctive relief against Defendants Bear Matthews ("Matthews") and Whop Inc. ("Whop") (collectively, "Defendants") and for monetary damages against Whop. In support of its claims, DubClub makes the following allegations. DubClub's investigation is ongoing and it reserves the right to amend this Complaint to add additional claims and parties.

## NATURE OF THE ACTION

1. This is an action for injunctive relief, attorneys' fees and costs, and damages premised on DubClub's claims for (a) breach of contract stemming from Matthews' violation of valid and enforceable confidentiality clauses that he entered into with DubClub and (b) Defendants' misappropriation of DubClub's trade secrets and proprietary information in violation of the Defend Trade Secrets Act of 2016 ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA").

2. Immediately prior to his employment with DubClub, Matthews worked for Whop. During one of his pre-hire interviews with DubClub, Matthews explained that Whop terminated his employment and that he was interested in working with DubClub because it is a competitor of Whop. DubClub ultimately decided to hire Matthews as its Head of Consumer Marketing, a position he held for approximately six months before abruptly resigning and immediately returning to work for Whop.

3. During his employment with DubClub, Matthews had access to extensive proprietary information and trade secrets regarding DubClub's business, products, customers, pricing, and strategies, as well as other confidential business information that is central to DubClub's continued success in the highly competitive sports content creator marketplace industry in which it conducts business. In order to protect its legitimate business interests in its proprietary information, trade secrets, customer relationships, and goodwill, DubClub required, as a condition of employment, that Matthews execute an Employee Invention Assignment and Confidentiality Agreement ("EIACA") which contained several restrictions on his conduct during and after his employment. Matthews executed the EIACA on February 17, 2025. A true and correct copy of the EIACA is attached hereto as **Exhibit A** and

incorporated herein by reference.

4. During his employment with DubClub and thereafter, Matthews was required to live up to duties of loyalty and other contractual obligations that he owed to DubClub under the EIACA and California law. Those duties include, among others, obligations not to compete against DubClub during his employment and not to misuse DubClub's confidential business information for competitive purposes during and after his employment with DubClub.

5. In the last week of his employment with DubClub, Matthews breached his duty of loyalty and contractual obligations owed to DubClub by misappropriating DubClub's confidential and proprietary information and trade secrets (the "Misappropriated Proprietary Information") for his and Whop's benefit.

6. After his resignation, Matthews continued his unauthorized use of the Misappropriated Proprietary Information to harm DubClub. Matthews and Whop have refused to return the Misappropriated Proprietary Information and have been unwilling to provide reasonable assurances that such information would no longer be used to harm DubClub thereby creating an imminent threat that Matthews has or will inevitably use and/or disclose DubClub's confidential and proprietary information and trade secrets to continue to unfairly compete against DubClub on behalf of Whop.

## PARTIES

7. DubClub is a Delaware corporation with its principal place of business in San Francisco, California.

8. On information and belief, Matthews was at all times relevant an individual residing in San Francisco, California. Plaintiff is also informed and believes that Matthews committed the majority of the unlawful acts alleged in this Complaint in San Francisco County.

9. On information and belief, Whop is a Delaware corporation with its principal place of business in Brooklyn, New York.

10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 because Plaintiff asserts a claim against Defendants under the DTSA, 18 U.S.C. § 1836.

/ / /

11. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because this Court has original jurisdiction over the DTSA claim and the state law claims are so related to the federal trade secret claim that they form part of the same case or controversy.

12. This Court has personal jurisdiction over Matthews because he resides in this District and committed acts in this District that are directly related to the claims at issue in this action.

13. This Court has personal jurisdiction over Whop because Whop transacts business in this District that is directly related to the claims at issue in this action.

14. Venue is proper in this District with respect to Matthews pursuant to 28 U.S.C. § 1391(b)(1) because Matthews resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

15. Venue is proper in this District with respect to Whop pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during the relevant time period, Whop transacted business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District.

## DIVISIONAL ASSIGNMENT

16. Assignment to the San Francisco Division is appropriate under Local Rule 3-2(c) and (e) because a substantial part of the events or omissions giving rose to DubClub's claims occurred in San Francisco County, California.

## FACTUAL ALLEGATIONS

### A. DubClub's Business

17. DubClub operates a digital marketplace and subscription platform that enables independent sports handicappers ("cappers") to sell digital content subscriptions directly to their subscribers. DubClub provides software tools and services for payment processing, customer management, and marketing. Beyond the standard customer relationship DubClub has with all of its cappers, some of DubClub's cappers enter independent contractor

agreements with DubClub to provide advisory services to DubClub (the "Contractor Agreements").

18. After DubClub vets and accepts new cappers to the platform, online users of DubClub's website can subscribe to their preferred cappers and receive subscription content through mobile app, email, and Discord. DubClub tracks how much cappers generate and users spend. DubClub has national and global users and regularly sells its products and services to users throughout the country and the world.

19. The sports content creator marketplace industry is highly competitive. DubClub competes for cappers and users with many other companies providing similar products and services in the marketplace, including Whop. DubClub distinguishes itself through its investment in its relationships with its cappers (also referred to herein as DubClub's "customers") and product development which gives DubClub a competitive advantage over other businesses in the same markets.

20. DubClub provides its sales and marketing personnel with a variety of confidential business information and trade secrets to enable them to sell and market DubClub's products and services effectively and to be responsive to the needs of prospective and existing cappers in the highly competitive amateur sports betting industry.

21. DubClub's success as a business is substantially based on its strong marketing and sales efforts aimed at existing and potential cappers. DubClub has invested a significant amount of time, money, and resources in its methods and processes for identifying potential cappers and DubClub's compilations of capper-specific marketing materials and customer relationship management ("CRM") databases are highly valuable documents that DubClub intentionally preserves as confidential.

22. DubClub does not merely consult a trade periodical or some other public document or source of information to identify prospective cappers. Instead, DubClub works methodically through its proprietary processes to identify prospective cappers who could benefit from DubClub's products and to determine how best to meet the particular requirements of existing cappers. In these processes, DubClub collects, analyzes, catalogues,

and utilizes certain proprietary and trade secret information of DubClub as well as proprietary information of existing cappers to give DubClub a competitive advantage against its competitors.

23. While this information is made available to authorized DubClub employees, it is treated as highly confidential and is not made available to persons outside of DubClub unless they are also subject to contractual confidentiality obligations. DubClub goes to great lengths to ensure that its CRM databases containing, among other things, the contact information of thousands of DubClub's existing and prospective cappers, as well as the financial terms of their contractual relationships with DubClub, are protected from unauthorized disclosure to competitors.

**B. <u>DubClub's Legitimate Business Interests</u>**

24. DubClub has a legitimate business interest in protecting its (a) trade secrets, (b) other valuable confidential and proprietary information, (c) relationships with its existing and prospective customers (i.e., cappers), and (d) goodwill in the industries for which DubClub sells its products and services.

25. DubClub takes reasonable measures to protect its trade secrets and other legitimate business interests from unauthorized disclosure. DubClub employees are instructed to treat as confidential any information and documents they receive regarding DubClub's proprietary marketing and sales methods and strategies and business plans, as well as any information shared with them concerning DubClub's prospective and existing cappers. Additionally, DubClub understands the irreparable injury that could be done by the unauthorized disclosure of its confidential and proprietary business information by current and former employees and seeks to protect its substantial investment in its strong relationships and goodwill with its cappers and prospective cappers. Accordingly, DubClub requires its employees to enter agreements with DubClub that contain provisions regarding nondisclosure and return of DubClub's company property and confidential information at the conclusion of their employment. Moreover, each of the confidentiality clauses in DubClub's agreements with its employees and its agreements with its cappers prohibit the use of DubClub's

proprietary information for the benefit of any person or entity except DubClub unless expressly authorized by DubClub.

26. Access to DubClub's confidential and proprietary data is restricted to the DubClub personnel who have legitimate business needs to access the information. Thus, even DubClub employees do not have unfettered access to its confidential and proprietary information and trade secrets.

**C. Matthews' Employment with DubClub**

27. Prior to accepting an offer of employment with DubClub, Matthews worked for Whop on its growth team. Whop is a direct competitor of DubClub. Among other similarities between Whop and DubClub that make them competitors of one another, Whop also sells technology for cappers to sell digital subscriptions using its platform.

28. In early 2025, Matthews submitted an online employment application to DubClub. During DubClub's subsequent interviews of Matthews, he expressed interest in moving to San Francisco to work for DubClub. Matthews also informed DubClub during these pre-hire interviews that Whop terminated his employment and that he was interested in working for DubClub because he knew DubClub and Whop are competitors.

29. On February 13, 2025, DubClub offered Matthews the position of Head of Consumer Marketing subject to certain terms set forth in a written offer letter ("Offer Letter"). Matthews signed the Offer Letter that same day.

30. The Offer Letter includes an arbitration provision which requires DubClub to arbitrate any and all claims it may have against Matthews except for its right to "seek injunctive or other provisional relief in court, where permitted by applicable law, including, but not limited to, in connection with the misappropriation of a party's private, proprietary, confidential or trade secret information." A true and correct copy of the Offer Letter is attached hereto as **Exhibit B** and incorporated herein by reference.

31. Paragraph 6 of the Offer Letter provides:

/ / /

/ / /

> **Protection of Confidential and Proprietary Information.** As an employee of the Company, you will have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions that will be the property of the Company. To protect the Company's interests, as a condition of employment, you must sign and abide by the Company's standard "Employee Invention Assignment and Confidentiality Agreement."

32. Paragraph 8 of the Offer Letter provides:

> **No Competition During Employment.** During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company. You will disclose to the Company in writing any other gainful employment, business or activity that you are currently associated with or participate in that competes with the Company. You will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company.

33. On February 17, 2025, Matthews and DubClub voluntarily entered into the EIACA. Matthews entered into the EIACA as a condition of his employment with DubClub as expressly stated in the Offer Letter. The EIACA contained restrictions on Matthews' conduct during and after his employment with DubClub.

34. Under the EIACA, Matthews agreed not to use or disclose any Proprietary Information, which information includes trade secret information belonging to DubClub, except as necessary to perform his job duties on behalf of DubClub. He further agreed not to use or disclose any of DubClub's Proprietary Information without DubClub's prior written consent. Specifically, Paragraph 8 of the EIACA (the "Proprietary Information Provision") provides as follows:

> I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may be made created or discovered by me or that may be disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence (the "Proprietary Information"). Without limitation as to the forms of that Proprietary Information may take, I acknowledge that Proprietary Information

may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge of know-how. Proprietary Information includes, but is not limited to, Assigned Inventions, marketing plans, product plans, designs, data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, customer and supplied lists, and the non-public names and addresses of the Company's customers and suppliers, their buying and selling habits and special needs.

35. Paragraph 9 of the EIACA (the "Confidentiality Provision") provides as follows:

> At all times, both during my employment and after its termination, and to the fullest extent permitted by law, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose any Proprietary Information without the prior written consent of the Company in each instance, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company. Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information. Nothing in this Section 9 or otherwise in this Agreement shall limit or restrict in any way my immunity from liability for disclosing the Company's trade secrets as specifically permitted by 18 U.S. Code Section 1833, the pertinent provisions of which are attached hereto as <u>Exhibit C</u>.

36. Paragraph 10 of the EIACA (the "Physical Property Provision") provides as follows:

> All documents, supplies, equipment and other physical property furnished to me by the Company or produced by me or others in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such items when requested by the Company, excepting only my personal copies of records relating to my employment or compensation and any personal property I bring with me to the Company and designate as such. Even if the Company does not so request, I will upon termination of my employment return to the Company all Company property, and I will not take with me or retain any such items.

37. Paragraph 13 of the EIACA (the "Company Opportunities; Duty Not to Compete Provision") provides as follows:

> During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects.

38. Paragraph 17 of the EIACA (the "Injunctive Relief Provision") provides as follows:

> I understand that a breach or threatened breach of this Agreement by me may cause the Company to suffer irreparable harm and that the Company will therefore be entitled to injunctive relief to enforce this Agreement.

39. Among other things, Paragraph 18 of the EIACA provides: "This Agreement will be governed by and construed in accordance with the laws of the State of California without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction."

40. Shortly after it hired him, DubClub issued Matthews an Apple laptop to use in connection with his position at DubClub.

41. Throughout his DubClub employment, Matthews had extensive access to DubClub's most sensitive confidential and proprietary business information and trade secrets of great competitive value in the industries in which DubClub provides its products and services, including proprietary and trade secret information associated with: actual and potential capper contact information, capper preferences and requirements, and pricing practices; business plans; and the structure of DubClub's sales and marketing teams, as well as other trade secret and proprietary business information regarding the manner in which DubClub identifies prospective cappers and provides its services and products to existing cappers.

/ / /

42. Matthews was only authorized by DubClub to access any of this proprietary and trade secret information for business-related purposes, and not for any other purpose, and this information is maintained and protected by DubClub as confidential and/or trade secret and is difficult or impossible to identify from publicly available information.

43. Upon information and belief, because he executed the EIACA and the Offer Letter, Matthews was well aware of the terms of the agreement, including the nondisclosure and confidentiality provisions, that DubClub requires its employees to comply with in order to protect DubClub's legitimate business interests.

**D. <u>Matthews' Pre-Resignation Misconduct</u>**

44. On August 12, 2025, just 6 days before he abruptly resigned his employment with DubClub, Matthews downloaded and exported DubClub's Master List of Customer Contact Information (the "Master List of Contact Information") that contained the names, emails, and phone numbers of 6,688 cappers who were active DubClub customers, or who were previously active DubClub customers, or who were considering becoming DubClub customers.

45. On August 15, 2025, just 3 days before he resigned, Matthews sent an email from his personal gmail account to his DubClub email account. The email contained a speech to text transcription of Matthews pitching Whop to one of DubClub's cappers. Shortly after Matthews resigned, this capper terminated his relationship with DubClub and moved to Whop.

46. Approximately five minutes before he submitted his email resignation to DubClub on August 18, 2025, Matthews visited a confidential internal DubClub document titled Partner Advisory Board "Cash Retainer" Supplementary Analysis ("PAB Analysis"). The PAB Analysis showed, among other things, the scheduled expiration date of each of DubClub's Contractor Agreements with its cappers, as well as the financial terms of each such contract.

47. On August 18, 2025, Matthews informed DubClub of his resignation via email which DubClub accepted that day.

/ / /

48. In his resignation email, Matthews informed DubClub personnel that he was "not exiting our industry," but did not inform DubClub that he planned to return to Whop at that time.

49. On August 19, 2025, Matthews met with the founders of DubClub in San Francisco to discuss his resignation. During that meeting, Matthews explained that he had received a call from Whop and flew out to meet with Whop's team in Brooklyn, New York in the days before his resignation. Matthews stated that he had signed an offer letter from Whop.

50. To be clear, Matthews' activities referenced in the preceding paragraphs that took place between August 12th through a few minutes before he submitted his resignation on August 18th occurred while Matthews was still employed with DubClub and before his resignation.

**E. <u>DubClub's Investigation and Matthews' Post-Resignation Misconduct</u>**

51. One of the many ways DubClub protects its trade secrets and confidential and proprietary information is to conduct a data access review after an employee ends his or her employment to determine whether the employee misappropriated proprietary or confidential DubClub information. Following Matthews' resignation, DubClub conducted a data access review of Matthews' computer activity before his resignation and discovered that Matthews downloaded DubClub's Master List of Contact Information on August 12, 2025.

52. Following his resignation, Matthews used confidential information contained in the Master List of Contact Information to contact DubClub cappers on their personal phones to share nonpublic information about DubClub in an effort to convince them to move to Whop. Many of these cappers notified DubClub about these communications because they were not sure how Matthews knew their personal phone numbers.

53. As of the date of this filing, at least 13 DubClub customers who were contacted by Matthews after he resigned on August 18, 2025, have transferred their business from DubClub to Whop.

54. On August 26, 2025, DubClub's Chief Executive Officer, Lewis Burik, called Matthews to discuss DubClub's concerns about his unauthorized use of DubClub's

confidential and trade secret information. Following this conversation, Mr. Burik sent a courtesy copy of Matthews' EIACA to him via email. After Matthews reviewed his EIACA, he called Mr. Burik back that same day and admitted that he obtained phone numbers for many of DubClub's cappers from the Master List of Contact Information and subsequently contacted them in connection with his employment at Whop.

55. On August 27, 2025, DubClub's attorneys sent cease and desist letters to Matthews and to Whop. In its letter to Matthews, DubClub demanded the immediate return of its proprietary and trade secret information and demanded further reasonable assurances from Matthews. Between that initial communication and the date of this filing, DubClub engaged in numerous additional efforts through its lawyers and lawyers representing Matthews to obtain the trade secret information that Matthews stole. Despite DubClub's prompt and good faith efforts to resolve the issues raised in this action, Matthews refused to return the materials or provide the requested reasonable assurances.

56. To date, Whop has not responded to the cease and desist letter that DubClub's attorneys sent to it on August 27, 2025, or to the follow-up correspondence that DubClub sent to Whop on September 4, 2025.

57. Matthews' extensive knowledge of DubClub's business secrets and his access to the files containing DubClub's confidential, proprietary, and trade secret information that he misappropriated have put him in a prime position at Whop to misuse his knowledge and possession of DubClub's confidential and proprietary information and trade secrets for his and Whop's benefit. These circumstances create an imminent threat that Matthews has already or will inevitably use or disclose DubClub's trade secrets and proprietary business information to Whop in order to unfairly compete against DubClub.

58. As of the date of this filing, DubClub has discovered evidence that Matthews has continued to send text messages to at least one DubClub capper regarding Whop as recently as October 1, 2025.

59. For the foregoing reasons, Matthews' breach of the EIACA, misappropriation of DubClub's trade secrets and proprietary information, and employment with Whop threatens

DubClub with irreparable harm in the form of loss of goodwill, exposure of DubClub's proprietary information and trade secrets, and the resulting loss of competitive advantage, among other things.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)

### (Against All Defendants)

60. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

61. The Misappropriated Proprietary Information constitutes a highly valuable selection of confidential business and proprietary information, which DubClub has spent substantial time, resources, and money developing and maintaining.

62. The Misappropriated Proprietary Information derives independent economic value from not being generally known to, and not being readily ascertainable through lawful means by, those who could obtain economics value from the disclosure or use of the information.

63. The Misappropriated Proprietary Information constitutes trade secrets as defined under 18 U.S.C. § 1839(3).

64. DubClub has taken reasonable measures to maintain the secrecy and confidentiality of its trade secrets and confidential and proprietary information, including the Misappropriated Proprietary Information. Among other steps, DubClub: requires employees with access to trade secrets and confidential or proprietary information to execute employment agreements containing nondisclosure provisions at the inception of their employment; does not share such confidential, proprietary, or trade secret information without efforts to maintain confidentiality and secrecy; and would never disclose this information to a competitor. DubClub's employment agreements make clear that employees are to treat as confidential non-public DubClub technical or business information shared with them concerning DubClub's business and customers. Further, DubClub limits access to its databases and computer systems

to the DubClub personnel who have legitimate business needs to access the information.

65. Defendants used improper means (including but not limited to theft, breach of duty to maintain secrecy, and unauthorized access) to obtain the Misappropriated Proprietary Information. Defendants knew or had reason to know that they had used or were using improper means to access and acquire Misappropriated Proprietary Information. Specifically, Matthews misappropriated the above-described trade secrets by acquiring the information by improper means, and is disclosing and/or utilizing, or threatens disclosing and/or utilizing, said trade secrets in connection with his employment with Whop. Plaintiff is informed and believes that Whop has misappropriated the above-described trade secrets by acquiring the information from Matthews, who owed contractual duties to DubClub not to disclose such information.

66. As a result of Defendants' actions, DubClub has suffered and will continue to suffer competitive harm and irreparable injury, and damages in an amount to be proven at trial.

67. Under 18 U.S.C. § 1836(b)(3)(B)(i), DubClub is entitled to damages from Whop for its actual losses and Whop's unjust enrichment, in amounts to be proven at trial. Alternatively, DubClub is entitled to damages from Whop measured by a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B)(ii).

68. Defendants' misappropriation of DubClub's trade secrets was willful and malicious. Thus, DubClub is entitled to exemplary damages from Whop under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees under 18 U.S.C. 1836(b)(3)(D).

69. DubClub has and will continue to sustain irreparable harm for which there will be no complete and adequate remedy at law as a direct and proximate result of the unlawful actions taken and threatened by Defendants.

70. As a result, Plaintiff is entitled to a preliminary and permanent injunction against Defendants and prohibiting the aforementioned misconduct pursuant to 18 U.S.C. 1836(b)(3)(A).

/ / /

/ / /

/ / /

## SECOND CLAIM FOR RELIEF

**Misappropriation of Trade Secrets (Cal. Civ. Code § 3426.1 et seq.)**

**(Against All Defendants)**

71. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72. The Misappropriated Proprietary Information constitutes trade secrets as defined in California Civil Code section 3426.1(d). It has economic value to Plaintiff in that Plaintiff has expended substantial time, money, and resources in developing said information, which is used in connection with Plaintiff's business and is not generally known to Plaintiff's competitors. Further, as alleged above, DubClub has made reasonable efforts to maintain the secrecy of the Misappropriated Proprietary Information.

73. As alleged above, Defendants used improper means (including but not limited to theft, breach of a duty to maintain secrecy, and unauthorized access) to acquire the Misappropriated Proprietary Information. Defendants knew or had reason to know that they had used or were using improper means to access and acquire the Misappropriated Proprietary Information.

74. As a direct, foreseeable, and proximate results of Defendants' actions, Plaintiff has suffered and continues to suffer substantial business losses, including but not limited to, the loss of its confidential trade secret information, loss of current and prospective sales, loss of good will, loss of profits, loss of value of trade secrets, loss of customer and vendor relationships, and loss of prospective advantageous relationships with customers and vendors.

75. Pursuant to Civil Code section 3426.3, DubClub is entitled to an award of the value of the unjust enrichment of Whop as a result of its misappropriation of DubClub's trade secrets.

76. Defendants committed the acts alleged herein maliciously, fraudulently, and with the wrongful intention of injuring DubClub's business and benefiting themselves. Defendants acted with an improper motive amounting to malice and a conscious disregard of DubClub's rights. Accordingly, pursuant to Civil Code section 3426.3(c), DubClub is entitled

to recover exemplary damages in an amount not exceeding twice the award of damages alleged above.

77. As a result of Defendants' acts as described herein, and which were undertaken in bad faith, and willfully and maliciously, DubClub has incurred and will continue to incur substantial attorneys' fees in connection with this matter. Pursuant to Civil Code section 3426.4, DubClub is entitled to an award of reasonable attorneys' fees in this action.

78. DubClub has and will continue to sustain irreparable harm for which there will be no complete and adequate remedy at law as a direct and proximate result of the unlawful actions taken and threatened by Defendants.

79. As a result, Plaintiff is entitled to a preliminary and permanent injunction against Defendants and prohibiting the aforementioned misconduct pursuant to Civil Code section 3426.2.

**THIRD CLAIM FOR RELIEF**

**Breach of Contract – Injunctive Relief**

**(Against Matthews)**

80. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81. As a condition of employment with DubClub, and for valuable consideration in the form of new employment and continued employment with DubClub, Matthews knowingly and voluntarily entered into the EIACA with DubClub.

82. DubClub has performed its obligations under the EIACA.

83. The EIACA is a valid and enforceable contract containing several covenants, the specific terms of which are set forth above, including the Proprietary Information, Confidentiality, and Physical Property Provisions. As discussed in detail above, the EIACA contains reasonable restrictions designed to protect DubClub's reasonable business interests in its (a) trade secrets and proprietary information, (b) other valuable proprietary information, (c) relationships with its existing and prospective customers and vendors, and (d) goodwill in the industries for which DubClub provides its products and services. Accordingly, the EIACA

prohibits Matthews from disclosing or using confidential proprietary information for the benefit of anyone other than DubClub for so long as such information remains confidential and proprietary.

84. During his employment with DubClub, Matthews was given access to, and possessed, trade secrets and proprietary and confidential business information pertaining to DubClub's business that confers on DubClub a competitive advantage over other companies in the industry that do not have or use such information. By way of the Proprietary Information and Confidentiality Provisions, Matthews had and still has a duty to maintain the secrecy of DubClub's trade secret and confidential business information. By way of the Physical Property Provision, Matthews had a duty to return to DubClub all documents, supplies, equipment and other physical property furnished to him by DubClub in connection with his employment.

85. As described in detail above, Matthews breached the EIACA with DubClub by stealing the Misappropriated Proprietary Information and using and/or disclosing this proprietary and confidential information to others for the benefit of Whop and himself. He further breached the EIACA by failing to return DubClub's laptop in the condition in which he received it at the time of his separation of employment.

86. Matthews' use and disclosure of DubClub's trade secrets and confidential business information has been and continues to be without DubClub's express or implied consent or authority.

87. Matthews consented to an injunction in the event of any breach of the provisions of the EIACA.

88. As a result of Matthews' breach of the EIACA, Plaintiff has and/or will suffer substantial and irreparable harm and will continue to suffer further damage and harm. Matthews' employment with Whop, a direct and indirect competitor of DubClub, and his conduct on behalf of that company, threatens further unauthorized use and disclosure by Matthews of DubClub's trade secrets and confidential and proprietary business information. The aforesaid conduct, unless restrained and enjoined, will cause Plaintiff immediate and irreparable harm for which Plaintiff has no adequate remedy at law. The damage to business

relations and the loss of potential business opportunities cannot be adequately compensated by monetary damages.

89. Thus, Plaintiff is entitled to a preliminary and permanent injunction requiring Matthews to abide by the terms of the EIACA.

## PRAYER FOR RELIEF

WHEREFORE, and in light of the foregoing, DubClub demands that judgment be made and entered in its favor and against Defendants as follows:

90. For an order (including, without limitation, a temporary, preliminary, and/or permanent injunction) (1) enjoining Matthews from further violating the Proprietary Information, Confidentiality, and Physical Property Provisions in the EIACA; (2) enjoining Defendants from further violating the DTSA and the CUTSA; (3) enjoining Defendants from making any further use of any intellectual property, information, data or digital assets obtained from DubClub, or derived from any intellectual property, information, data or digital assets obtained from DubClub; (4) enjoining Defendants from contacting any and all customers and prospective customers of DubClub whose identities are contained in the Misappropriated Proprietary Information; (5) ordering Defendants to immediately return all DubClub equipment, tangible and intangible materials, and information that remain in Defendants' possession, custody, or control; (6) ordering Defendants to identify, and turn over, any property in their possession, custody, or control containing or reflecting the Misappropriated Proprietary Information, including hard copy documents or any form of electronic storage media; (7) ordering Defendants to identify any other persons, entities, or locations not within their possession, custody, or control, to which Defendants have transmitted, disseminated, disclosed, or stored any of DubClub's Misappropriated Proprietary Information; (8) ordering Defendants to produce to DubClub or a third-party vendor the computing devices that Defendants used or could have used to access, transfer, or download the Misappropriated Proprietary Information to forensically preserve and mirror/image said computing devices; (9) ordering Defendants to provide the logins, user IDs, passwords, and any other processes necessary to obtain access to the computing devices Defendants used or could have used to

access, transfer, or download the Misappropriated Proprietary Information; and (10) any other appropriate injunctive relief;

91. Award DubClub actual and/or compensatory damages and damages for any unjust enrichment in an amount to be determined at trial from Whop;

92. Award DubClub damages measured by a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B)(ii) from Whop;

93. Award DubClub exemplary damages as permitted by law, including under 18 U.S.C. § 1836(b)(3)(B)(C) and California Civil Code § 3426.3(c) from Whop;

94. Award DubClub all costs and attorneys' fees it incurs in the prosecution of this lawsuit as permitted by law, including under 18 U.S.C. § 1836(b)(3)(D) and California Civil Code § 3426.4;

95. Award DubClub pre- and post-judgment interest; and

96. Grant such other relief as this Court deems necessary or appropriate.

**JURY DEMAND**

Plaintiff demands a jury trial of all issues for which there is a right to trial by a jury.

Dated: October 8, 2025

IAN A. WRIGHT
KAITLIN H. OWEN
ALSTON & BIRD LLP

By: */s/ Kaitlin H. Owen*
Kaitlin H. Owen

Attorneys for Defendant
DUBCLUB, INC.

# EXHIBIT A

DubClub

**EMPLOYEE INVENTION ASSIGNMENT and CONFIDENTIALITY AGREEMENT**

In consideration of, and as a condition of my employment with DubClub, Inc., a Delaware corporation with its principal offices in the State of California (the "***Company***"), I, as the "***Employee***" signing this Employee Invention Assignment and Confidentiality Agreement (this "***Agreement***"), hereby represent to the Company, and the Company and I hereby agree as follows:

1. **Purpose of Agreement.** I understand that the Company is engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights. Accordingly, I am entering into this Agreement, whether or not I am expected to create inventions or other works of value for the Company. As used in this Agreement, "***Inventions***" means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets.

2. **Disclosure of Inventions.** I will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that I make, create, conceive or first reduce to practice, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets.

3. **Work for Hire; Assigned Inventions.** I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment will be "works made for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works. I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by me for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "***Assigned Inventions***"), will be the sole and exclusive property of the Company.

4. **Excluded Inventions and Other Inventions.** Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by me or acquired by me prior to the Effective Date (as defined in Section 25, below), and which are not to be assigned to the Company ("***Excluded Inventions***"). If no such list is attached, I represent and agree that it is because I have no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development. For purposes of this Agreement, "***Other Inventions***" means Inventions in which I have or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions. I acknowledge and agree that if, in the scope of my employment, I use any Excluded Inventions or any Other Inventions, or if I include any Excluded Inventions or Other Inventions in any product or service of the Company or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, I will immediately so notify the Company in writing. Unless the Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to the Company, in such circumstances (whether or not I give the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

5. **Exception to Assignment.** I understand that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under the provisions of Section 2870 of the California Labor Code, which are attached hereto as Exhibit B.

6. **Assignment of Rights**. I agree to assign, and do hereby irrevocably transfer and assign, to the Company: (i) all of my rights, title and interests in and with respect to any Assigned Inventions; (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (iii) to the extent assignable, any and all Moral Rights (as defined below) that I may have in or with respect to any Assigned Inventions. I also hereby forever waive and agree never to assert any Moral Rights I may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 4, even after termination of my employment with the Company. "***Moral Rights***" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

7. **Assistance**. I will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide. I will execute and deliver any documents that the Company may reasonably request from me in connection with providing such assistance. My obligations under this section will continue beyond the termination of my employment with the Company; provided that the Company agrees to compensate me at a reasonable rate after such termination for time and expenses actually spent by me at the Company's request in providing such assistance. I hereby appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose. I agree that this appointment is coupled with an interest and will not be revocable.

8. **Proprietary Information.** I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may be made, created or discovered by me or that may be disclosed to me by the Company or a third party in relation to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company, or any other party with whom the Company agrees to hold such information or materials in confidence (the "***Proprietary Information***"). Without limitation as to the forms that Proprietary Information may take, I acknowledge that Proprietary Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how. Proprietary Information includes, but is not limited to, Assigned Inventions, marketing plans, product plans, designs, data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, customer and supplier lists, and the non-public names and addresses of the Company's customers and suppliers, their buying and selling habits and special needs.

9. **Confidentiality**. At all times, both during my employment and after its termination, and to the fullest extent permitted by law, I will keep and hold all Proprietary Information in strict confidence and trust. I will not use or disclose any Proprietary Information without the prior written consent of the Company in each instance, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company. Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information. Nothing in this Section 9 or otherwise in this Agreement shall limit or restrict in any way my immunity from liability for disclosing the Company's trade secrets as specifically permitted by 18 U.S. Code Section 1833, the pertinent provisions of which are attached hereto as Exhibit C.

10. **Physical Property**. All documents, supplies, equipment and other physical property furnished to me by the Company or produced by me or others in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such items when requested by the Company, excepting only my personal copies of records relating to my employment or compensation and any personal property I bring with me to the Company and designate as such. Even if the Company does not so request, I will upon termination of my employment return to the Company all Company property, and I will not take with me or retain any such items.

11. **No Breach of Prior Agreements**. I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, confidentiality, non-competition, or other agreement with any former employer or other party. I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of my own or of a former employer or third party that are not generally available for use by the public or have not been legally transferred to the Company.

12. **"At Will" Employment**. I understand that this Agreement does not constitute a contract of employment or obligate the Company to employ me for any stated period of time. I understand that I am an "at will" employee of the Company and that my employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, by either the Company or by me. I acknowledge that any statements or representations to the contrary are ineffective, unless put into a writing signed by the Company. I further acknowledge that my participation in any stock option or benefit program is not to be construed as any assurance of

continuing employment for any particular period of time.

13. **Company Opportunities; Duty Not to Compete**. During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects.

14. **Non-Solicitation of Employees/Consultants**. During my employment with the Company and for a one (1) year period thereafter, I will not directly or indirectly solicit away employees or consultants of the Company for my own benefit or for the benefit of any other person or entity, nor will I encourage or assist others to do so.

15. **Use of Name & Likeness**. I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

16. **Notification**. I hereby authorize the Company, during and after the termination of my employment with the Company, to notify third parties, including, but not limited to, actual or potential customers or employers, of the terms of this Agreement and my responsibilities hereunder.

17. **Injunctive Relief**. I understand that a breach or threatened breach of this Agreement by me may cause the Company to suffer irreparable harm and that the Company will therefore be entitled to injunctive relief to enforce this Agreement.

18. **Governing Law; Severability**. This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the duties of its employees and the protection of its trade secrets. This Agreement will be governed by and construed in accordance with the laws of the State of California without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction. If any provision of this Agreement is invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible, given the fundamental intentions of the parties when entering into this Agreement. To the extent such provision cannot be so enforced, it will be stricken from this Agreement and the remainder of this Agreement will be enforced as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

19. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement.

20. **Entire Agreement**. This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between the parties hereto with respect to such subject matter.

21. **Amendment and Waiver.** This Agreement may be amended only by a written agreement executed by each of the parties to this Agreement. No amendment or waiver of, or modification of any obligation under, this Agreement will be enforceable unless specifically set forth in a writing signed by the party against which enforcement is sought. A waiver by either party of any of the terms and conditions of this Agreement in any instance will not be deemed or construed to be a waiver of such term or condition with respect to any other instance, whether prior, concurrent or subsequent.

22. **Successors and Assigns; Assignment**. Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will bind and benefit the parties and their respective successors, assigns, heirs, executors, administrators, and legal representatives. The Company may assign any of its rights and obligations under this Agreement. I understand that I will not be entitled to assign or delegate this Agreement or any of my rights or obligations hereunder, whether voluntarily or by operation of law, except with the prior written consent of the Company.

23. **Further Assurances**. The parties will execute such further documents and instruments and take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement. Upon termination of my employment with the Company, I will execute and deliver a document or documents in a form reasonably requested by the Company confirming my agreement to comply with the post-employment obligations contained in this Agreement.

24. **Acknowledgement**. I certify and acknowledge that I have carefully read all of the provisions of this Agreement and

that I understand and will fully and faithfully comply with this Agreement.

25. **Effective Date of Agreement**. This Agreement is and will be effective on and after the first day of my employment by the Company, which is February 17, 2025, (the "***Effective Date***").

**By:**

**Employee**

Name Bear Matthews

Signature BEAR MATTHEWS

**DubClub, Inc.**

Name Ryan A Gaertner

Title CEO + Head of Product + Acting CFO

Signature RAG

**Exhibit A**

**LIST OF EXCLUDED INVENTIONS UNDER SECTION 4**

| Title | Date | Identifying Number or Brief Description |
|---|---|---|

X No inventions, improvements, or original works of authorship

__ Additional sheets attached

Signature of Employee: BEAR MATTHEWS

Print Name of Employee: Bear Matthews

Date: February 14, 2025

**Exhibit B**

**CALIFORNIA LABOR CODE 2870 NOTICE**:

California Labor Code Section 2870 provides as follows:

> Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade

secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under California Labor Code Section 2870(a), the provision is against the public policy of this state and is unenforceable.

## Exhibit C

**DEFEND TRADE SECRETS ACT, 18 U.S. CODE § 1833 NOTICE:**

18 U.S. Code Section 1833 provides as follows:

> **Immunity From Liability For Confidential Disclosure Of A Trade Secret To The Government Or In A Court Filing.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made, (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.
>
> **Use of Trade Secret Information in Anti-Retaliation Lawsuit.** An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

# EXHIBIT B

# DubClub

## offer letter

*for*

Bear Matthews

February 13, 2025

### Congratulations!

Hi Bear,

Thank you for your time getting to know DubClub and letting us get to know you during the interview process. The team believes you would be a great addition to DubClub. We are very excited to present you with the offer here – congratulations!

The offer detailed below is a summary of the terms for your full-time employment and details your salary, equity, and benefits, as well as some additional things to know before starting.

If you have any questions at all, please feel free to contact us: ryan@dubclub.win or burik@dubclub.win. We're looking forward to hopefully working with you. Let's Win More Together™!

Ryan Gaertner
CEO & Founder

Lewis Burik
COO & Founder

## Role summary

**POSITION**

Head of Consumer Marketing

**START DATE**

February 17, 2025

**YOUR EMPOWERER**

Ryan

**EMPLOYEE BENEFITS**

Full participation

## Compensation summary

**ANNUAL SALARY**

Base: $130,000 USD

Variable: $20,000 USD

**OPTIONS GRANTED**

4992

**STRIKE PRICE**

TBD[1]

**OPTION VESTING SCHEDULE**

Monthly for 4 years with 1-year cliff

**TOTAL COST TO EXERCISE**

TBD based on updated strike price

1 Subject to change based on the Company's current 409A valuation

## Benefits & perks

**MEDICAL**

DubClub covers up to 50% of insurance costs[2]

Dental, Vision, Life, and Disability insurance offerings also available

**HOME OFFICE**

Work-From-Home stipend up to $1,000 for office equipment

**PAID TIME OFF (PTO)**

15 days[3]

## The details

1. **Employment Relationship**. Employment with the Company is for no specific period of time. Should you accept our offer, you will be an at-will employee of the Company, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause. Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) are superseded by this agreement. Further, your participation in any stock option or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and practices, may change from time to time, the "at-will" nature of your employment may be changed only in an express, written employment agreement signed by you and a duly authorized officer of the Company (other than you).
2. **Compensation**. Your base salary will be **$130,000**. You will be paid in accordance with the Company's regular payroll schedule, which is subject to change.
3. **Employee Benefits**. As an employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits. You will receive a description of these benefits during the onboarding process. The Company reserves the right to change or otherwise modify, in its sole discretion, the preceding terms of employment
4. **Paid Time Off.** In accordance with Illinois law, exempt employees will accrue vacation days at a rate of 15 days per year, beginning on your date of hire. This accrual will be prorated based on your start date in the current calendar year then reset the following calendar year to align with January 1 accrual. Additionally, pursuant to Illinois law, any unused vacation at the end of each calendar year will reset. Upon termination, any unused vacation days accrued during the calendar

2 Percentage of medical, dental, and vision coverage by the Company varies based on your chosen enrollment plan and number of dependents. Insurance coverage starts first of the month following your date of hire.

3 As approved by Empowerer with >3 days by the employee

year will be paid out to you. Requests for paid time off must be approved by supervisors in alignment with business needs and staffing levels, at the discretion of the supervisor.

5. **Equity.** Your option to purchase **4992** shares of the Company's common stock (the "Option") is subject to approval by the Company's Board of Directors (the "Board") and will be priced at the fair market value as determined by the Board as of the date of grant.The anticipated Option will be governed by the terms and conditions of the Company's 2021 Equity Incentive Plan (the "Plan") and your grant agreement, and will include a four year vesting schedule, under which 25% of your Option will vest 12 months after the vesting commencement date, and 1/48th of the total shares will vest at the end of each month thereafter, until either the Option is fully vested or your continuous service (as defined in the Plan) terminates, whichever occurs first. Your ownership percentage is subject to dilution over time.
6. **Protection of Confidential and Proprietary Information.** As an employee of the Company, you will have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions that will be the property of the Company. To protect the Company's interests, as a condition of employment, you must sign and abide by the Company's standard "Employee Invention Assignment and Confidentiality Agreement."
7. **No Breach of Obligations to Prior Employers.** We wish to impress upon you that we do not want you to, and we hereby direct you not to, bring with you any confidential or proprietary material of any former employer or violate any other obligations you may have to any former employer. You represent that your signing of this offer letter, agreement(s) concerning stock options granted to you, if any, under the Plan and the Company's Employee Invention Assignment and Confidentiality Agreement and your commencement of employment with the Company will not violate any agreement currently in place between yourself and current or past employers.
8. **No Competition During Employment.** During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company. You will disclose to the Company in writing any other gainful employment, business or activity that you are currently associated with or participate in that competes with the Company. You will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company.
9. **At Will Employment.** Employment with the Company is for no specific period of time. Should you accept our offer, you will be an at-will employee of the Company, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause. Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this letter) are superseded by this agreement. Further, your participation in any stock option or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and practices, may change from time to time, the "at-will" nature of your employment may be changed only in an express, written employment agreement signed by you and a duly authorized officer of the Company (other than you).
10. **Tax Matters.** All forms of compensation referred to in this agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.
11. **Authorization to Work.** Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States. If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.
12. **Arbitration and Class Action Waiver.** To the fullest extent permitted by law, you and the Company agree to submit to mandatory binding arbitration, pursuant to and governed by the Federal Arbitration Act (the "FAA"), any and all claims that (a) you may have against the Company and its directors, officers, owners, employees, agents, successors and assigns, and (b) the Company may have against you, arising out of or related to your employment with the Company and the termination thereof, including, but not limited to, claims for unpaid wages, wrongful termination,

torts, stock or stock options or other ownership interest in the Company, discrimination, harassment and/or retaliation based upon any federal, state or local ordinance, statute, regulation or constitutional provision, and individual claims under the California Private Attorneys General Act (California Labor Code Section 2698, et seq.) ("PAGA") (collectively, "Arbitrable Claims"). Further, to the fullest extent permitted by law, you and the Company agree that no class or collective actions can be asserted in arbitration, court or any other forum. All claims must be brought solely in your or the Company's individual capacity, and not as a plaintiff or class member in any purported class or collective proceeding.

Notwithstanding the foregoing, nothing in this arbitration provision restricts: (w) your right under the FAA to elect to pursue claims for sexual harassment and/or sexual assault in court, on an individual, class action or collective action basis; (x) your right, if any, to file in court a non-individual, representative action under PAGA, if you have standing to pursue such an action and it is permitted under applicable law; (y) your right to file administrative claims you may bring before any government agency where, as a matter of law, the parties may not restrict the employee's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor, and before state agencies in connection with claims for workers' compensation, unemployment and/or disability insurance benefits); or (z) a party's right to seek injunctive or other provisional relief in court, where permitted by applicable law, including, but not limited to, in connection with the misappropriation of a party's private, proprietary, confidential or trade secret information.

SUBJECT TO THE ABOVE, THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS. THE PARTIES FURTHER WAIVE ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION PERTAINING TO ANY CLAIMS BETWEEN YOU AND THE COMPANY.

The arbitration shall be conducted through JAMS before a single neutral arbitrator, in accordance with the JAMS employment arbitration rules then in effect, provided however, that the FAA, including its procedural provisions for compelling arbitration, shall govern and apply to this arbitration provision. The JAMS rules may be found at https://www.jamsadr.com/rules-employment. If you are unable to access these rules, please let me know and I will provide you with a hardcopy. Unless the parties agree otherwise, the arbitration hearing shall take place in the JAMS office nearest to your current or most recent former place of work. The arbitrator shall issue a written decision that contains the essential findings and conclusions on which the decision is based. This arbitration provision is governed by and will be construed in accordance with the FAA, and it shall only apply to claims that are subject to mandatory binding arbitration under applicable law. If, for any reason, any term of this arbitration provision is held to be invalid or unenforceable, all other valid terms and conditions herein shall be severable in nature and remain fully enforceable.

13. **Background Check.** This offer is contingent upon a satisfactory verification of criminal, education, driving and/or employment background. This offer can be rescinded based upon data received in the verification.
14. **Entire Agreement.** This offer, once accepted, constitutes the entire agreement between you and the Company with respect to the subject matter hereof and supersedes all prior offers, negotiations and agreements, if any, whether written or oral, relating to such subject matter. You acknowledge that neither the Company nor its agents have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this agreement for the purpose of inducing you to execute the agreement, and you acknowledge that you have executed this agreement in reliance only upon such promises, representations and warranties as are contained herein.
15. **Severability.** The provisions of this offer letter are severable, and if any part of it is found to be invalid or unenforceable, including, but not limited to, the arbitration provision above, the other parts shall remain fully valid and enforceable.

## Offer letter acceptance

Congratulations, again! We are thrilled at the prospect of you joining. I hope this offer letter was helpful. I'm looking forward to your acceptance and working together soon.

Sincerely,

Ryan Gaertner
Founder & CEO

I have read and accept this employment offer:

Signature:

Date: